United States District Court
for the District of Maryland
Northern Division

| | |
|---|---|
| SHAVON T. WALKER<br>325 P Street, N.W.<br>#1010<br>Washington, D.C. 20024,<br><br>      **Plaintiff**<br><br>  v.<br><br>THE CHILDREN'S GUILD, INC.<br>a/k/a Children's Guild Alliance<br>6802 McClean Boulevard<br>Baltimore, Maryland 21234,<br><br>      **Defendant** | **Civil Action No.** |

**COMPLAINT**
*(Discrimination, retaliation, wrongful termination)*

This action is brought on behalf of plaintiff Shavon T. Walker, a Black special education teacher who was terminated from her employment with defendant The Children's Guild, Inc. (a/k/a Children's Guild Alliance) in retaliation for her advocacy on behalf of her disabled students, and who was subjected to discipline and selective enforcement of workplace rules that amounted to invidious discrimination when compared with the treatment of her White peers. This retaliatory and unequal workplace treatment altered the terms and conditions of Ms. Walker's employment, leading to her termination in April 2021. This termination caused Ms. Walker lost income, diminution of other employment-based benefits, increased professional and educational costs, impaired professional opportunities, and emotional distress. She seeks compensation for these losses, along with reimbursement of her reasonable legal fees and non-fee litigation costs, and any other appropriate relief.

*Jurisdiction and venue*

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343, as this action presents federal questions, including questions arising under United States civil rights laws.

2. The Court may exercise supplemental jurisdiction over any state or local law claims presented, pursuant to 28 U.S.C. §1367(a).

3. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(b), as the defendant maintains a place of business in this jurisdiction and a substantial part of the events or omissions giving rise to this action occurred in this jurisdiction.

*Parties*

4. Plaintiff Shavon T. Walker ("Ms. Walker") is an adult resident of the District of Columbia, residing at the address given in the caption.

5. Defendant The Children's Guild, Inc. a/k/a Children's Guild Alliance ("TCG") is a not-for-profit corporation that maintains a principal office at the address given in the caption.

6. Ms. Walker was, at all relevant times, an "employee" of TCG within the meaning of all applicable federal, state, and local statutes, codes, regulations, and ordinances.

7. TCG serves children with disabilities, primarily the disabilities of emotional disturbance, autism spectrum disorder, and/or multiple disabilities. TCG operates various facilities at several locations in Maryland and the District of Columbia.

8. Ms. Walker is a certified special education teacher. She was employed by TCG in that capacity from July 23, 2018 through June 14, 2019, and from March 9, 2020 through April 9, 2021. She worked at TCG's non-public (private special education) school at 410 East Jeffery Street, Baltimore, Maryland 21225.

9. TCG was, at all relevant times, Ms. Walker's "employer" within the meaning of all applicable federal, state, and local statutes, codes, regulations, and ordinances.

*Factual background*

10. The general description for the position Ms. Walker held with TCG required her "to plan and carry out a therapeutically designated program to meet the academic and social/emotional needs of emotionally disturbed children."

11. In her second tour of duty with TCG, Ms. Walker was assigned to teach students in grades 9 through 12 at the Baltimore campus.

12. When TCG hired Ms. Walker in March 2020, she was working toward certification as a Board Certified Behavior Analyst ("BCBA"). Field experience is required to earn this certification, which in turn requires observation of the certification candidate by a licensed BCBA. TCG agreed to allow those observations to take place during Ms. Walker's teaching time at TCG, a motivating factor in Ms. Walker's decision to accept TCG's employment offer.

13. TCG special education students at the Baltimore campus are typically placed and funded there by public school systems that are unable to meet those students' special education

needs in their public programs. Students who are placed at TCG for this reason have been found eligible for special education services pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.* ("IDEA"), and are to be educated in accordance with their individualized education programs ("IEPs"), which must conform to the detailed and exacting legal requirements found in the IDEA.

14. A nonpublic school that accepts students with IEPs agrees to implement those IEPs with fidelity, broadly meaning that the school will provide the services required by the IEP (*e.g.,* various therapies, a specific environment and/or class size, classroom and/or individual aides, modified curriculum content, alternative methods of delivering education); will work on specific goals and objectives set forth in each student's IEP in such areas as reading, mathematics, written expression, social/emotional/behavior, organization, and others; and will maintain detailed and accurate records of the services provided to each student and the student's progress toward achieving his/her goals and objectives.

15. A student is deemed eligible for special education, and receives an IEP, following an intensive process in which s/he is evaluated and observed to determine whether any difficulties the student is experiencing in school result from a disabling condition, the nature of the disability, the degree to which it impedes the student's education, and the type and extent of services the student needs in order to make meaningful educational progress commensurate with his/her abilities, taking the disabilities into account.

16. IEP progress must be tracked and measured, according to specific methods for each goal identified in the IEP. This requires accurate data collection by persons familiar with the student's IEP requirements and work toward his/her goals.

17. IDEA also obligates the schools and professionals who work with special education students to be vigilant in monitoring changes in their students. For example, if a student's behavior pattern or ability to handle assigned work changes, that may signal a need for re-evaluation or consideration of the existence of a previously unsuspected disability, separate from any disability already identified when the student was found eligible for special education.

18. Upon Ms. Walker's return to teaching at TCG in March 2020, she realized that TCG was not meeting its legally imposed IDEA obligations in many ways. For example, she was asked to write reports containing information for students she did not oversee, to create false grade reports, to grade students she did not teach, and to draft IEP goals for students in subjects she did not teach. Ms. Walker observed other problems that reportedly included, but were not limited to: (a) aides were not assigned to students whose IEPs called for 1:1 aide support; (b) students who were struggling beyond what could reasonably be expected in light of their known disabilities were not assessed to determine whether previously undetected disabling conditions were present; (c) student data were not recorded accurately or completely; (d) parents were not kept informed of their children's progress consistent with IDEA requirements; (e) disciplinary issues (for which IDEA has specific requirements) were not addressed properly; (f) while students attended school virtually in response to the Covid-19 pandemic, TCG did not adhere to guidelines promulgated by the United States Department of Education and the Maryland State Department of Education that special education students were to receive their IEP services "to the greatest extent possible"; (g) TCG had unqualified teachers teaching core academic subjects; (h) students were not provided technology or materials they needed to succeed; (i) students were placed

in classes that could not facilitate their IEP goals and objectives; and (j) at least one student was assigned to classes that were too demanding for him.

19. Ms. Walker called to the attention of TCG's administration the IDEA compliance problems she observed, suggested solutions, and asked for additional support in order to meet her students' needs, but TCG did not act to correct these problems. Instead, she was told in March 2021 to stop sending emails about TCG's IDEA and other shortcomings.

20. After Ms. Walker began to protest TCG's failure to meet IDEA requirements or to properly implement students' IEPs, TCG commenced criticizing Ms. Walker's job performance with the intent of terminating her employment. For example, on November 30, 2020, Ms. Walker received a written warning for missing two meetings although Ms. Walker explained that she had used the time to complete student grades, an activity required of a special education teacher and essential to TCG's compliance with state and federal requirements. Other teachers missed TCG meetings for the same reason but, to Ms. Walker's knowledge, they were not similarly disciplined. At about the same time that it issued the written warning to Ms. Walker, TCG advertised an opening for a high school math teacher at the Baltimore campus–the position Ms. Walker held and the subject she taught at the location where she taught.

21. Ms. Walker inquired about the apparent advertisement for her particular position, and was told that this was a general posting to develop standby staff for positions throughout the Children's Guild Alliance; however, this explanation did not correlate with the specificity of the listing, and no other openings were posted at that time. After Ms. Walker inquired, the job post was changed to a general special education position and then was removed

completely. It returned in its original form following Ms. Walker's termination from employment.

22. On February 17, 2021, Ms. Walker was placed on a performance improvement plan ("PIP"), allegedly for poor performance, and given 60 days to improve. The PIP provided that Ms. Walker's progress in meeting its goals would be reviewed in 30, 45, and 60 days–or by March 19, 2021, April 3, 2021, and April 18, 2021. None of the enumerated reviews took place. Instead, Ms. Walker was notified on April 8, 2021 that her employment was terminated. Whether she had improved in any area covered by the PIP was never addressed.

23. On February 23, 2021, Ms. Walker was subjected to an unscheduled formal observation of one of her classes to assess her teaching proficiency. This conflicted with the standard TCG practice of notifying teachers in advance if their classes were to be observed for this purpose. Instead, Ms. Walker was told that the purpose of the observation was to gather information about a particular student, about whom there were concerns. The observer rated Ms. Walker "unsatisfactory" or "developing" in almost all areas.

24. During the same time period that TCG was purportedly concerned about Ms. Walker's job performance, a TCG administrator wrote a letter recommending her for a graduate program at Johns Hopkins University ("JHU"). The statements in the letter were inconsistent with TCG's claimed justification for placing Ms. Walker on the PIP, and ultimately for terminating her. The BCBA who was observing Ms. Walker for her certification, who was not a TCG employee, also wrote a recommendation letter.

25. While employed by TCG, Ms. Walker also noticed and protested apparent unequal treatment of White and Black students, and White and Black staff.

26. Disparate treatment of students was manifested in inconsistent discipline of White and Black students. Black students were more likely to be disciplined for offenses for which White students received no adverse consequences. Ms. Walker and the rest of her team were directed by a White supervisor not to communicate with the parents of one of her Black students, and to instead redirect all further inquiries from that parent to the White supervisors, purportedly because the parent was calling the supervisors too much–an inexplicable and unworkable arrangement, because teachers needed to be able to communicate directly with the parent about the student's needs and progress, and the inability to do so would harm the student. There was no response to Ms. Walker's protests about this arrangement.

27. TCG's policies and procedures were applied unequally to White and Black staff. For example, Ms. Walker received warnings for missing staff meetings, while a White teacher who regularly missed meetings was not criticized (to Ms. Walker's knowledge). Ms. Walker similarly observed that some White teachers appeared to be excused from job requirements, such as creating behavioral tools/trackers to collect IEP-required data, and completing work. Ms. Walker was once asked to complete work that should have been done by a White teacher, adding to her existing workload without recognition of the additional burden this would create for her. One time, a White teacher announced at a staff meeting that she had rewarded a student for good performance with a reward (food) that TCG policy expressly forbade; however, the White teacher was praised for this action.

28. Ms. Walker also observed that while she and another Black teacher supported the largest number of students in the high school in the classes they taught, White teachers with fewer students were provided greater resources. This led to unequal job responsibilities (*e.g.,* more work to grade, more grade reports to prepare, more IEP components to prepare) and consequent difficulties in meeting TCG performance expectations, ultimately allowing TCG to accuse Ms. Walker and the other Black teacher of performance issues and impeding their ability to properly instruct and support their students.

29. Ms. Walker was further directed to attend training sessions from which White staff were excused.

30. On April 8, 2021, TCG notified Ms. Walker that her employment was terminated, but did not initially give her a reason for the discharge. Her April 9, 2021 termination letter also states no reason for the reason, and instead says only that TCG "will not be extending another offer to you for the upcoming school year," although the current school year would not end for approximately two more months.

31. Ms. Walker was later told that her position was terminated for alleged poor performance, but no specific deficiencies were identified to her, nor was her progress (or claimed lack thereof) on her PIP reviewed with her.

32. Another Black teacher was discharged from TCG employment at about the same time as Ms. Walker. Like Ms. Walker, the teacher was (to Ms. Walker's knowledge) given no explanation for the decision.

33. When TCG terminated Ms. Walker's employment in April 2021, the BCBA who had been observing her teaching at TCG discontinued her observations, impeding Ms. Walker's progress toward her BCBA certification. Ms. Walker eventually found another person to continue the observations, in a different location, but at additional cost. The need to find another BCBA also delayed Ms. Walker's completion of the certification process and interfered with her opportunities for employment during summer 2021.

34. Following Ms. Walker's discharge, TCG refused to allow Ms. Walker to review her personnel file, despite the provision in the TCG Personnel Handbook that grants employees access to their own files. The relevant provision is:

> Employees who wish to review their own file should contact their supervisor of Human Resources. With reasonable advanced notice, the employee may review his/her personnel file in the administrative office and in the presence of a human resource representative.

35. TCG also inhibited Ms. Walker's effort to secure new employment. In approximately December 2021, Ms. Walker received an offer from Baltimore County Public Schools ("BCPS") to work there as a special education teacher. She accepted the offer; however, in order to complete the hiring process, BCPS required verifications of Ms. Walker's prior employment and completion of a Maryland Employment History Review Child Sexual Abuse and Sexual Misconduct form, required by MD. CODE ANN. (Education) §6-113.2. TCG delayed sending a proper confirmation of Ms. Walker's prior employment until January 2, 2022, and did not submit the required form to confirm that Ms. Walker had not been accused of sexual abuse or misconduct while employed by TCG until Ms. Walker engaged counsel to intervene on her behalf.

36. Had TCG not terminated Ms. Walker's employment in April 2021, she reasonably expected that she would have remained employed there through the end of the 2020-21 school year, would have been offered employment as a TCG teacher during the summer (extended school year) session, and would have been offered a position for the 2021-22 school year. Ms. Walker would also have progressed more rapidly toward BCBA certification and completion of the separate JHU graduate program. Both, once completed, would have enhanced Ms. Walker's future career prospects.

37. As a result of TCG's discrimination and retaliation, Ms. Walker has suffered losses, including lost income and other work-related benefits, the cost of seeking new employment, the cost of continuing work toward her BCBA certification and professional growth, emotional distress, lost or delayed opportunities for professional improvement, and legal fees and related costs.

38. Ms. Walker filed a charge of discrimination and retaliation against TCG on August 16, 2021 (Charge #531-2021-02231) with the United States Equal Employment Opportunity Commission ("EEOC"), cross-filed with the Baltimore Community Relations Commission. The charge was amended on August 19, 2021.

39. On December 15, 2022, the EEOC issued its determination that it would not proceed further with its investigation of Ms. Walker's charge and that it had made no determination as to the charge's merits. The charge is now closed.

40. Ms. Walker has exhausted any and all administrative requirements precedential to pursuing her claims against TCG in court.

**COUNT ONE**
*(Retaliation/Americans with Disabilities Act)*

41. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

42. Disabled students who have qualified for services under the IDEA are protected against discrimination on account of their status as persons with disabilities under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

43. Ms. Walker's advocacy to TCG on behalf of her disabled students constituted protected activity under the ADA.

44. When TCG terminated Ms. Walker in response to her advocacy on behalf of her disabled students, it retaliated against her in violation of the ADA, which prohibits retaliation against an individual who engages in protected activity.

45. As a result of TCG's retaliation, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

**COUNT TWO**
*(Retaliation/Maryland Human Relations Act)*

46. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

47. Disabled students who have qualified for services under the IDEA are protected against discrimination on account of their status as persons with disabilities under the Maryland Human Relations Act, MD. CODE ANN. (State Government) § 20-101 *et seq.* ("Md. HRA").

48. Ms. Walker's advocacy to TCG on behalf of her disabled students constituted protected activity under the Md. HRA.

49. When TCG terminated Ms. Walker in response to her advocacy on behalf of her disabled students, it retaliated against her in violation of the Md. HRA, which prohibits retaliation against an individual who engages in protected activity.

50. As a result of TCG's retaliation, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

## COUNT THREE
*(Retaliation/Baltimore Community Relations Code)*

51. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

52. Disabled students who have qualified for services under the IDEA are protected against discrimination on account of their status as persons with disabilities under Article Four of the Baltimore City Code (Community Relations) ("Article Four").

53. Ms. Walker's advocacy to TCG on behalf of her disabled students constituted protected activity under Article Four.

54. When TCG terminated Ms. Walker in response to her advocacy on behalf of her disabled students, it retaliated against her in violation of Article Four, which prohibits retaliation against an individual who engages in protected activity.

55. As a result of TCG's retaliation, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

## COUNT FOUR
*(Discrimination/Title VII of the Civil Rights Act of 1964)*

56. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

57. The disparate treatment Ms. Walker received, as compared to the treatment White employees of TCG received, constitutes discrimination on account of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"").

58. This discriminatory treatment created the problems that TCG then wrongly claimed were performance issues that it used to justify terminating Ms. Walker's employment.

59. When TCG terminated Ms. Walker for discriminatory reasons, it discriminated against her in violation of Title VII.

60. As a result of TCG's discrimination, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

## COUNT FIVE
*(Discrimination/Maryland Human Relations Act)*

61. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

14

62. The disparate treatment Ms. Walker received, as compared to the treatment White employees of TCG received, constitutes discrimination on account of her race in violation of the Md. HRA.

63. This discriminatory treatment created the problems that TCG then wrongly claimed were performance issues that it used to justify terminating Ms. Walker's employment.

64. When TCG terminated Ms. Walker for discriminatory reasons, it discriminated against her in violation of the Md. HRA.

65. As a result of TCG's discrimination, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

**COUNT SIX**
*(Discrimination/Baltimore Community Relations Code)*

66. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

67. The disparate treatment Ms. Walker received, as compared to the treatment White employees of TCG received, constitutes discrimination on account of her race in violation of Article Four.

68. This discriminatory treatment created the problems that TCG then wrongly claimed were performance issues that it used to justify terminating Ms. Walker's employment.

69. When TCG terminated Ms. Walker for discriminatory reasons, it discriminated against her in violation of Article Four.

70. As a result of TCG's discrimination, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

## COUNT SEVEN
*(Wrongful termination)*

71. Ms. Walker repeats and realleges the allegations in ¶¶1-40 above as if fully set forth.

72. Under Maryland law, even an at-will employee is protected against discharge from her employment if the reason for the discharge is that the employee opposed and/or refused to participate in illegal activities.

73. Ms. Walker's opposition to and refusal to participate in the illegal and discriminatory activities at TCG were a motivating reason for TCG to terminate her employment and consequent refusal to extend her employment through summer 2021 and beyond.

74. TCG's termination of Ms. Walker's employment under the described circumstances was against public policy and a wrongful termination under Maryland law.

75. As a result of TCG's discrimination, Ms. Walker has suffered economic losses and emotional distress, for which she is entitled to compensation.

**Wherefore,** based upon the foregoing, Ms. Walker demands judgment as follows:

A. Damages in an amount to be determined at trial;

B. Punitive damages, to the fullest extent permitted by law, in an amount to be determined at trial;

C. Pre- and post-judgment interest on all sums awarded, at the highest rate permitted by law;

D. An award of the costs Ms. Walker has incurred in this action, including reasonable attorney's fees to the fullest extent permitted by law; and

E. Such other and further relief as the Court deems just and proper.

### Jury demand

Plaintiffs demand trial by a jury as to all issues so triable.

/s/    *Diana M. Savit*
Diana M. Savit #02739
**SAVIT & SZYMKOWICZ, LLP**
4520 East-West Highway, Suite 700
Bethesda, Maryland 20814
(301) 951-9191
(240) 536-9156 (fax)
dms@savitlaw.com
Attorneys for plaintiff